IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VARIANT HOLDING COMPANY, LLC,[1] | ) | Case No. 14-12021 (BLS) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| VARIANT HOLDING COMPANY, LLC, | ) | Adv. Proc. No. 15-_____ (BLS) |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| COURTLAND GETTEL, individually and as trustee | ) | |
| for WALKER'S DREAM TRUST, GETTEL | ) | |
| CHILDREN'S TRUST, GETTEL CHILDREN'S | ) | |
| TRUST 2, and GETTEL CHILDREN'S TRUST 3; | ) | |
| PETER CASH DOYE; JEFFREY H. | ) | |
| GREENBERG; MICHAEL BERNSTEIN; | ) | |
| THOMAS O. WAGNER, II; KATHRYN | ) | |
| NIGHSWANDER (formerly, Kathryn Gettel); | ) | |
| CONIX, INC.; JH GREENBERG & ASSOCIATES, | ) | |
| PLLC; HELENA, LLC; SUI GENERIS, LLC; | ) | |
| PREMIER HOME DEVELOPMENT GROUP LLC; | ) | |
| FORWARD PROGRESS ENTERPRISES, LLC; | ) | |
| VARIANT MANAGEMENT COMPANY, LLC; | ) | |
| CONIX WH HOLDINGS, LLC; NUMERIC | ) | |
| HOLDING COMPANY LLC; VARIANT | ) | |
| ROYALTY GROUP, LP; and TOMMY BOY, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**COMPLAINT FOR (I) CONTEMPT OF COURT;
(II) CONVERSION; (III) TURNOVER OF MISAPPROPRIATED FUNDS;
(IV) INJUNCTIVE RELIEF IN CONNECTION WITH SUBSIDIARY SALE
PROCESS; (V) DECLARATORY JUDGMENT, (VI) BREACH OF FIDUCIARY
DUTY, (VII) PROFESSIONAL NEGLIGENCE/LEGAL MALPRACTICE, AND
<u>(VIII) RECOVERY OF AVOIDABLE TRANSFERS</u>**

---

[1] The last four digits of the Debtor's federal tax identification number are (4044). The Debtor's service address is: Variant Holding Company, LLC, c/o Development Specialists, Inc., 333 S. Grand Ave, Suite 4070, Los Angeles, CA 90071-1544.

Plaintiff Variant Holding Company, LLC ("Plaintiff" or the "Debtor"), the debtor and debtor in possession in the above-captioned chapter 11 case, hereby brings suit against Defendants Courtland Gettel ("Gettel" or "Mr. Gettel"), individually and as trustee for Walker's Dream Trust, Gettel Children's Trust, Gettel Children's Trust 2, and Gettel Children's Trust 3; Peter Cash Doye ("Doye" or "Mr. Doye"); Jeffrey H. Greenberg ("Greenberg" or "Mr. Greenberg"); Michael Bernstein ("Bernstein" or "Mr. Bernstein"); Thomas O. Wagner, II; Kathryn Nighswander (formerly, Kathryn Gettel); Conix, Inc.; JH Greenberg & Associates, PLLC ("Greenberg & Associates"); Helena, LLC; Sui Generis, LLC; Premier Home Development Group LLC; Forward Progress Enterprises, LLC; Variant Management Company, LLC; Conix WH Holdings, LLC; Numeric Holding Company, LLC; Variant Royalty Group, LLC; and Tommy Boy, LLC (together, "Defendants") for:  (i) contempt of court for willful violation of this Court's *Order Pursuant to Sections 105(a) and 363(a) of the Bankruptcy Code and Bankruptcy Rule 9019 Approving Settlement Agreement with the Beach Point Funds* [Docket No. 152] (the "Beach Point Settlement Order"), entered on November 3, 2014, and *Order Denying Motion for Payment of Property Level Claims from Proceeds of Sale of Property of Non-Debtor Entities* [Docket No. 357] (the "Order Denying Property Level Claims"), entered on June 1, 2015; (ii) conversion; (iii) turnover of misappropriated funds pursuant to 11 U.S.C. §§ 105(a), 542(a); (iv) injunctive relief in connection with the Debtor's subsidiary sale process under 11 U.S.C. § 105(a), Fed. R. Bankr. P. 7001(7), 7065; (v) declaratory judgment with respect to the matters addressed herein; (vi) breach of fiduciary duty; (vii) professional negligence/legal malpractice; and (viii) recovery of avoidable transfers under 11 U.S.C. §§ 548 and 550.

-2-

**Preliminary Statement**

1.      The Debtor seeks to put an end to the misconduct and malfeasance of the Debtor's former principals, current equity holders, and their various designees and affiliates, and to recover misappropriated funds and to collect damages from Defendants for the multitude of wrongs that they have been perpetrated upon the Debtor and this estate.

2.      Most recently, on July 16, 2015, Defendants Gettel and Greenberg absconded with $750,000 from an account owned by the Debtor's indirect subsidiary, Laser Focus Commercial Investments, LLC ("Laser Focus").[2] Funds were inadvertently deposited into this account by the servicing agent (Trimont Real Estate Advisors) for the current mortgage lender (Centennial Commercial Finance Group) on fourteen of the Debtor's subsidiaries' properties in Texas (the "H14 Portfolio").  On the very next day, Mr. Greenberg's office authorized a wire transfer of these funds to an entity called Tommy Boy, LLC, which upon information and belief is an entity owned and controlled by Mr. Gettel.  Mr. Greenberg is the registered agent for this entity.  None of the Defendants have any legal or equitable rights or interests to the transferred funds.  Despite assurances from Mr. Greenberg that these funds would be returned on July 17, 2015, the funds have not been returned.  These funds are necessary to fund operational expenses, including payroll and maintenance, at the H14 Portfolio.  The Debtor seeks immediate turnover of these now stolen funds.

---

[2]  As represented to the Court at the hearing on Bankruptcy Rule 2004 discovery on July 16, 2015, Mr. Greenberg confirmed that he formerly represented the Debtor and its subsidiaries, and continues to represent the Debtor's equity holders and various of their affiliates in actions related to the original representation.  These representations are adverse to the interests of the Debtor and its subsidiaries, and the Debtor has demanded that Mr. Greenberg cease any further representations that are both directly related and clearly adverse to the interests of his former clients, the Debtor and its subsidiaries.

3.      Mr. Gettel and his cohorts have also continued to interfere with the ongoing

efforts of the Debtor's subsidiaries to consummate the Court-approved sale of the H14 Portfolio

and the Debtors' eight remaining properties in Texas and the East Coast.  On or about July 9,

2015, Mr. Greenberg's office purported to record numerous liens against portions of the H14

Portfolio located in Harris County, Brazoria County, and Dallas County, Texas.  These liens are

based on the same property level claims, and equitable subrogation theory, that this Court

expressly disallowed pursuant to the Order Denying Property Level Claims.  *See* Transcript of

May 26, 2015 Hearing at p. 69 (COURT:  "Specifically, I find that the [Beach Point] settlement

agreement precludes the assertion of recovery of claims articulated in the motion for payment of

property level claims.").  Separately, Mr. Doye took it upon himself to notify Michael Lynd, a

principal of the buyer of the subsidiary assets, of the filing of the foregoing liens and the

assertion of property level claims against the subsidiary sellers.  Mr. Doye also threatened that

"any purchaser with notice of these claims has successor liability for the payment of any portion

of the claims which are not paid from the sale proceeds."  On July 20, 2015, Mr. Greenberg, on

behalf of Defendant Michael Bernstein, sent a letter to buyer's counsel advising the buyer of

purported claims that exist at property level entities in connection with certain electricity

contracts purportedly guaranteed by Mr. Bernstein.  The foregoing actions are:  (a) in direct

contravention of the Beach Point Settlement Order and the Order Denying Property Level

Claims, (b) in contempt of court, and (c) tortiously interfering with the Debtor's subsidiary sale

process.  The Debtor seeks to immediately compel the relevant Defendants to release all property

DOCS_SF:88152.5 89703/002

level liens and to enjoin such Defendants from taking any further actions that interfere with the subsidiary sale process.

4.        In addition, the Debtor seeks damages for Defendants' prepetition mismanagement and the recovery of any fraudulent transfers.  In late 2013, Mr. Gettel, through various affiliates, caused the Debtor to borrow $73.5 million from the predecessors of BPC VHI, L.P., Beach Point Total Return Master Fund, L.P., and Beach Point Distressed Master Fund, L.P. ("Beach Point"), for the purpose of acquiring interests in various property-owning entities.  Mr. Gettel, through his affiliates and accomplices, also made various draws on the mortgage loan against the H14 Portfolio (the lender at the time was Doral Bank) purportedly in order to renovate and improve the properties.  In connection with such loans, Defendants effectuated an elaborate scheme to skim money and divert funds to Mr. Gettel and his accomplices.  This misconduct involved the creation of millions of dollars of fake invoices for renovations and appliance purchases that were never completed and never intended to be completed.  The invoices were used to procure millions of dollars in capital expenditure draws that were then funneled to Mr. Gettel and other Defendants at the expense of the Debtor and this estate.

5.        Another tactic employed by Defendants prepetition involved the diversion of proceeds from property sales to which the lenders were entitled under applicable loan documents.  Multiple shell companies were created or used by Mr. Gettel and others to fraudulently invoice the lender for services that were never performed in connection with such sales.  By skimming millions of dollars in expenses on various asset sales, Mr. Gettel and others were able to personally enrich themselves at the expense of the Debtor and this estate.  Several of

-5-

the Defendants are under active investigation by the Federal Bureau of Investigation and the U.S. Department of Justice.  Defendants Gettel, Doye, and Greenberg went on to forge documents and create a fictitious bank account to convince Beach Point that $6 million was being held in escrow when in fact the funds had already been taken by Mr. Gettel.  While breaching their fiduciary duties to the Debtor, the properties that serve as the collateral for the loans fell into dramatic disrepair, and required the Debtor on a postpetition basis to borrow in excess of $13 million from Beach Point through a debtor-in-possession financing facility.

6.     Defendants, either directly or as affiliates of the signatories thereto, are parties to the Beach Point Settlement Agreement (as defined below), and submitted themselves to the jurisdiction of this Court over any and all claims relating thereto.  The Beach Point Settlement Agreement resolved the various prepetition claims amongst Defendants and Beach Point, provided that Beach Point was paid in full on its allowed claims in this case.  Instead, Defendants' prior and continuing wrongful actions to enrich themselves, while denuding this estate and stalling the subsidiary sale process, have made it impossible for the Debtor to repay Beach Point in full out of sale proceeds.

7.     Based on the foregoing, the Debtor brings suit for an order finding the applicable Defendants in contempt of court for willful violation of the Beach Point Settlement Order and the Order Denying Property Level Claims, conversion, turnover of misappropriated funds, breach of fiduciary duty, professional negligence/legal malpractice, and recovery of fraudulent transfers.  Plaintiff seeks damages, including compensatory and punitive damages, based on such

Defendants' contempt of court and participation in a flagrant fraudulent scheme, in an amount to be proven at trial.

## Jurisdiction and Venue

8.      This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and § 1334(b).  This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

9.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1409.

10.     This adversary proceeding is commenced pursuant to Rules 7001 and 7065 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), sections 105(a), 542(a), 548, and 550 of title 11 of the United States Code (the "Bankruptcy Code"), and 28 U.S.C. §§ 2201 and 2202.

## The Parties

11.     Plaintiff Variant Holding Company, LLC, a Delaware limited liability company, is the debtor and debtor in possession in the above-captioned chapter 11 case.

12.     Plaintiff is informed and believes, and based thereon alleges, that Defendant Courtland Gettel is an individual residing in the City of La Jolla, California, County of San Diego, and is the Trustee for Defendants Walker's Dream Trust, Gettel Children's Trust, Gettel Children's Trust 2, and Gettel Children's Trust 3.

13.     Plaintiff is informed and believes, and based thereon alleges, that Mr. Gettel owns, manages, or controls, directly or indirectly, Defendants Conix, Inc., Sui Generis, LLC, Forward Progress Enterprises, LLC, Variant Management Company, LLC, Conix WH Holdings,

-7-

LLC, Numeric Holding Company, LLC, Variant Royalty Group, LLC, and Tommy Boy, LLC, each of which is a Delaware limited liability company (except Tommy Boy, LLC and Conix, Inc., which are Arizona entities, and Sui Generis, LLC, which is a Texas entity). Mr. Gettel was previously the Chief Executive Officer of the Debtor. Defendants Conix, Inc., Conix WH Holdings, LLC, Numeric Holdings Company, LLC, Walker's Dream Trust, and Variant Royalty Group, LLC (together, the "Equity Holders") are the holders of the membership interests in the Debtor.

14.    Plaintiff is informed and believes, and based thereon alleges, that Defendant Peter Cash Doye is an individual residing in the City of La Jolla, California, County of San Diego. Mr. Doye was previously the Senior Managing Director of the Debtor.

15.    Plaintiff is informed and believed, and based thereon alleges, that Defendant Kathryn Nighswander (formerly, Kathryn Gettel) is an individual residing in the City of La Jolla, California, County of San Diego. Ms. Nighswander was previously married to Courtland Gettel.

16.    Plaintiff is informed and believes, and based thereon alleges, that Defendant Michael Bernstein is an individual residing in the City of La Jolla, California, County of San Diego. Mr. Bernstein was previously the President of the Debtor.

17.    Plaintiff is informed and believed, and based thereon alleges, that Defendant Thomas O. Wagner, II is an individual residing in the City of San Diego, California.

18.    Plaintiff is informed and believes, and based thereon alleges, that Defendant Premier Home Development Group LLC is a Delaware limited liability company. Upon

information and belief, Mr. Wagner manages, directs, or otherwise controls Defendant Premier Home Development Group LLC.

19.     Plaintiff is informed and believes, and based thereon alleges, that Defendant Jeffrey H. Greenberg is an individual residing in the City of Tucson, Arizona.

20.     Plaintiff is informed and believes, and based thereon alleges, that Defendant JH Greenberg & Associates, PLLC is an Arizona professional limited liability company.  Upon information and belief, Mr. Greenberg manages, directs, or otherwise controls Greenberg & Associates.  Mr. Greenberg was formerly counsel to the Debtor and its subsidiaries.

21.     Plaintiff is informed and believes, and based thereon alleges, that Defendants ratified and/or authorized the conduct of one another, or conspired with each other, in doing the acts and omissions alleged in this complaint.

22.     Plaintiff is informed and believes, and based thereon alleges, that at all relevant times to this complaint, each of the Defendants was the co-conspirator, alter ego, agent, employee, servant, affiliate, subsidiary, partner, member, associate, or representative of each of the remaining Defendants, and in doing or omitting to perform the acts alleged herein, was acting within the course and scope of the agency, employment, service, partnership, membership, association, and/or representative relationship and with knowledge and consent of their respective principals, employees, masters, and/or parent entities.

**Factual Background**

A.      **The Bankruptcy Proceedings**

23.      On August 28, 2014 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

24.      The Debtor continues in the possession of its properties, and is operating and managing its affairs as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in the Debtor's case.

B.      **The Beach Point Settlement**

25.      Soon after the Petition Date, Beach Point filed the *Motion of the Beach Point Funds for an Order Directing the Appointment of a Chapter 11 Trustee* [Docket No. 20] (the "Trustee Motion").  Beach Point also objected to the *Motion of Debtor Pursuant to 11 U.S.C. §§ 105(a) and 363(b) to Employ and Retain Development Specialists, Inc. to Provide a Chief Restructuring Officer, Additional Personnel, and Financial Advisory and Restructuring-Related Services, Nunc Pro Tunc As of the Petition Date*, as supplemented [Docket Nos. 4, 63] (the "CRO Application").  Both the Trustee Motion and the CRO Application were resolved through a global settlement.

26.      On October 20, 2014, the Debtor filed the *Motion of the Debtor Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019 for an Order Approving Settlement Agreement with the Beach Point Funds* (the "Beach Point Settlement Motion") [Docket No. 107], seeking approval of that certain *Settlement Agreement* dated as of October 17, 2014 (the "Beach Point Settlement Agreement," a copy of which is attached to the

-10-

Beach Point Settlement Order as Exhibit 1), by and between the Debtor, its subsidiaries listed on

Exhibit A to the Beach Point Settlement Agreement, and those individuals and entities (including

certain of the Defendants) listed on Exhibit B to the Beach Point Settlement Agreement (the

"Settling Non-Debtor Party Defendants"), on the one hand, and Beach Point, and those

individuals and entities listed on Exhibit C to the Beach Point Settlement, on the other hand.

27.     Defendants Gettel, Kathryn Nighswander (formerly, Kathryn Gettel), Conix, Inc.,

Walker's Dream Trust, Gettel Children's Trust, Gettel Children's Trust 2, Gettel Children's

Trust 3, Conix Commercial Investments, LLC, Conpartments LLC, Numeric Commercial

Investments, LLC, and Conix Commercial, LLC, and the Settling Non-Debtor Party Defendants,

which consist of Peter Cash Doye, Michael Bernstein, Helena, LLC, Thomas O. Wagner, II,

Premier Home Development Group, LLC, Sui Generis WS, LLC, Jeffrey H. Greenberg, and JH

Greenberg & Associates, PLLC, are also parties to the Beach Point Settlement Agreement, and

along with the Debtor are referred to collectively therein as the "Defendant Parties."

28.     The Beach Point Settlement Agreement contains various provisions restricting

distributions to the Defendant Parties or their "Affiliates,"[3] which necessarily include the Equity

Holders and the other Defendants hereto.

29.     The Beach Point Settlement Agreement contemplated that the Debtor's subsidiary

assets would be sold and the proceeds therefrom, after payment of the mortgage debt and other

legitimate third party expenses at the property level, would be distributed to Beach Point on

---

[3] "Affiliate" is defined in the Beach Point Settlement Agreement to mean:  "as to any Person, or any other Person (other than an individual) directly or indirectly Controlling, Controlled by, or under direct or indirect common Control with such Person."  Beach Point Settlement Agreement at § 12(a)(i).

account of its allowed claim pursuant to an agreed waterfall, net of a carveout for professional

fees. *See* Beach Point Settlement Agreement at § 5. The Beach Point Settlement Agreement is

crystal clear that Defendants, including the Equity Holders, would have no say over the sale

process:

> For the avoidance of doubt, Variant's CRO, subject to the oversight of the Board of Managers (as modified pursuant to Section 2(b) below), shall have full control and decision-making authority, subject to the terms of this Agreement, with respect to the operations, management and governance of the Debtor and the Subsidiaries, including but not limited to any decisions related to the sale of the Properties and any use of cash, whether generated from the operation or sale of the Properties, or from any draw down on funding under the DIP Loan (as defined below) or any other source. The Defendant Parties shall have no decision-making authority in connection with the operations, management and governance of the Debtor and the Subsidiaries, and shall not be consulted unless necessary to preserve the value of the Properties or to otherwise obtain relevant background information. *Further, for the avoidance of doubt, the Defendant Parties shall have no control or decision-making authority at any time over the use or distribution of proceeds from the sale of the Properties until all amounts owing to the Beach Point Funds pursuant to the terms of this Agreement are indefeasibly paid and satisfied in full, and the CRO shall be responsible for ensuring that no such proceeds are used or distributed in any way inconsistent with the terms of this Agreement.*

Beach Point Settlement Agreement at § 2(a) (emphasis added).

30.    Further, the Beach Point Settlement Agreement, in numerous provisions, prohibits

any distributions to the Defendant Parties or their Affiliates, absent Beach Point's consent. For

instance, the Debtor's use of proceeds of the DIP Loan (as defined in the Beach Point Settlement

Agreement) is subject to the following provision:

> No proceeds of the DIP Loan shall be used to make a payment to any Defendant Party, the Non-Settling Non-Debtor Party

Defendants, or any Affiliates thereof without the prior written
consent of the Beach Point Funds.

Beach Point Settlement Agreement at § 4(b).

31.     With respect to the proceeds of subsidiary asset sales, the Beach Point Settlement

Agreement contains explicit waterfall provisions specifying that Defendants receive nothing

unless Beach Point consents otherwise.  No such consent is forthcoming unless and until Beach

Point is paid in full.  Specifically, section 5(c) of the Beach Point Settlement Agreement provides

as follows:

> c.     Proceeds from the Sale of an H14 Property or Other
> Property.  Proceeds from the Sale of any property listed on Exhibit
> D hereto shall be paid or applied as follows through escrow:
>
> i.     First, to pay (a) ordinary costs necessary to close
> such Sale, including reasonable broker fees, and the amount
> necessary to pay the applicable release price to the "Senior
> Lender" as set forth on Exhibit D, and (b) any outstanding
> payables that were incurred in the ordinary course of the Debtor
> Parties' business and not paid from proceeds of the DIP Loan;
> provided, however, that *no payment may be made to any
> Defendant Party, the Non-Settling Non-Debtor Party Defendants,
> or any Affiliates thereof without the prior written consent of the
> Beach Point Funds*.

Beach Point Settlement Agreement at § 5(c)(i) (emphasis added).

* * * *

> d.     Proceeds from the Sale of an FX3 Property.
> Proceeds from the Sale of any property listed on Exhibit E
> (collectively, the "FX3 Properties") hereto shall be paid or applied
> as follows through escrow:
>
> i.     First, to pay (a) ordinary costs necessary to close
> such Sale, including reasonable broker fees, and the amount
> necessary to pay the applicable release price to the "Senior
> Lender" against such FX3 Property as set forth on Exhibit E, and
> (b) any outstanding payables that were incurred in the ordinary
> course of the Debtor Parties' business and not paid from proceeds
> of the DIP Loan; provided, however, that *no payment may be made*

*to any Defendant Party, the Non-Settling Non-Debtor Party Defendants, or any Affiliates thereof without the prior written consent of the Beach Point Funds.*

Beach Point Settlement Agreement at § 5(d)(i) (emphasis added).

\* \* \* \*

   f. <u>Restrictions on Use of Property Proceeds</u>.  Any and all monies generated from the Properties (not including proceeds from the Sale of the Properties which are governed by Section 5 above) may be used only: (i) for the payment of expenses and outstanding payables with respect to the Properties, only if such expenses and payables are incurred in the ordinary course of the Debtor Parties' business, *are not paid to any Defendant Party, the Non-Settling Non-Debtor Party Defendants, or any Affiliates thereof, and were not paid from proceeds of the DIP Loan*; (ii) for capital expenditures to maintain and preserve the Properties in the ordinary course of business and to remedy any health and safety issues at the Properties or any violations of any state, municipal or other administrative rule or regulation governing the Properties; and (iii) to serve any loans that are secured by first priority deeds of trust against the Properties; <u>provided</u>, <u>however</u>, that all such payments or expenditures must be made in accordance with a budget to be proposed (a) by the CRO with the recommendation of the Asset Manager, or (b) if within thirty (30) days of the execution of this Agreement, by the CRO, with any budget to be approved by the Lenders in their reasonable discretion.  The Parties agree that any dispute between the CRO and the Lenders regarding any budget pursuant to this Section 8(f) shall be resolved by the Bankruptcy Court, and that any decision or order of the Bankruptcy Court with respect to such dispute shall be final and non-appealable.  *No monies may be paid or distributed to any Defendant Party, the Non-Settling Non-Debtor Party Defendants, or any Affiliates thereof without the prior written consent of the Lenders.*

Beach Point Settlement Agreement at § 8(f) (emphasis added).

  32. In addition, under the Beach Point Settlement Agreement, it is an Event of Default if "[t]he Debtor Parties fail to satisfy or fulfill any obligations as required under [the Beach Point Settlement Agreement], including without limitation those set forth in Section 8(c)(ii)(A), (e), or (f) above."  Beach Point Settlement Agreement at § 9(a)(vi).

-14-

33.     The Beach Point Settlement Agreement also provides that any distribution or allocation of sale proceeds consistent with the agreement shall be under the "sole direction and control" of the Debtor's Chief Restructuring Officer.  Section 5(a)(vi) of the Beach Point Settlement Agreement states as follows:  "The proceeds of any Sale, under the sole direction and control of the CRO, shall be distributed and allocated pursuant to the terms set forth in Section 5(c) and (d) [of the agreement] . . . ."

34.     In consideration of the foregoing provisions of the Beach Point Settlement Agreement, the Defendant Parties, on the one hand, and Beach Point, on the other hand, released all claims amongst each other, including all claims as to prepetition wrongful conduct alleged in a state court complaint that had been commenced by Beach Point, provided that certain releases held by Beach Point are not effective until its prepetition loan and DIP Loan are paid in full, and the Defendants who guaranteed the Beach Point loan agreed to the entry of stipulated judgments against them in the event of a default under the Beach Point Settlement Agreement.  *See* Beach Point Settlement Agreement at §§ 10(d), 11.  The Debtor did not release any claims that it possesses against Defendants.

35.     On November 3, 2014, the Court entered the *Order Pursuant to Sections 105(a) and 363 of the Bankruptcy Code and Bankruptcy Rule 9019 Approving Settlement Agreement with the Beach Point Funds* [Docket No. 152] (the "Beach Point Settlement Order") approving the Beach Point Settlement Agreement.  This Court reserved jurisdiction under the Beach Point Settlement Order "to hear and determine all matters arising from or related to the implementation, enforcement, or interpretation of this Order."  *See* Beach Point Settlement Order

-15-

at ¶ 9.  The Beach Point Settlement Agreement itself contains a jurisdiction provision pursuant to which each party "irrevocably and unconditionally" agreed that "any legal action, suit or proceeding against it with respect to any matter under or arising out of or in connection with this Agreement or the breach, termination, enforcement, interpretation or validity thereof, may and shall be brought solely and exclusively before the Bankruptcy Court . . . ."  *See* Beach Point Settlement Agreement at § 12(g).  The parties to the Beach Point Settlement Agreement also agreed that legal remedies for breach of the agreement would be inadequate and therefore agreed, in addition to any remedies at law, that parties shall be entitled to seek "equitable relief in the form of specific performance, a temporary restraining order, a temporary or permanent injunction, or any other equitable remedy which may be available."  *Id.* at § 12(h).

36.     Beach Point has noticed a default of the Beach Point Settlement Agreement upon certain of the Defendants and has sought entry of stipulated judgments based, among other reasons, on certain Defendants' continuing efforts to challenge the subsidiary sale process (as addressed below).

**C.     The Debtor's Interests in Subsidiaries and Pending Sale Process**

37.     The Debtor and its direct and indirect subsidiaries were a commercial real estate company with indirect ownership interests in approximately 27 apartment complexes and other real property interests in Arizona, Georgia, Maryland, Nevada, South Carolina, Texas and Virginia (the "Properties").  The Debtor is the ultimate parent within the organization.

38.     The Debtor commenced a process for the sale of the Sellers' assets during the Summer of 2014 with the hiring of an investment banker and real estate brokers.  A thorough marketing process followed.

39.     After months of negotiations and addressing claims asserted by various competing claimants, on March 4, 2015, the Debtor filed the *Debtor's Motion for Order: (I) Authorizing Debtor to Cause Its Non-Debtor Subsidiaries to Sell Their Assets Pursuant to the Portfolio Purchase and Sale Agreements; and (II) Authorizing Debtor to Take All Necessary and Appropriate Actions in Connection With The Foregoing* [Docket No. 255] (the "Original Sale Motion").  Pursuant to the Original Sale Motion, the Debtor proposed to cause its subsidiaries  to sell the bulk of their real estate assets to an affiliate of Lynd Residential Properties ("Lynd") for $275 million in the aggregate, pursuant to the terms of two portfolio purchase and sale agreements, one for the sale of the subsidiaries' Las Vegas Portfolio (three properties) in the amount of $40 million and one for the sale of the subsidiaries' Texas/East Coast Portfolio (twenty-three properties) in the amount of $235 million.

40.     On March 11, 2015, the Court approved the Original Sale Motion and entered the *Order: (I) Authorizing Debtor to Cause Its Non-Debtor Subsidiaries to Sell Their Assets Pursuant to the Portfolio Purchase and Sale Agreements; and (II) Authorizing Debtor to Take All Necessary and Appropriate Actions in Connection With the Foregoing* [Docket No. 279].

41.     The closing of the sale of the subsidiaries' Las Vegas Portfolio occurred on March 26, 2015 for $40 million, as agreed pursuant to the original purchase and sale agreement and approved by this Court.

-17-

42.     The sale of the subsidiaries' Texas/East Coast Portfolio under the original purchase and sale agreement did not close.  Lynd sought a substantial price reduction due to various issues identified through due diligence.  The parties engaged in extensive, arms' length negotiations in an effort to reach a deal.

43.     On May 14, 2015, the parties executed an amendment to the original purchase and sale agreement for the Texas/East Coast Portfolio that included a reduction of the purchase price from $235 million to $205 million.

44.      On May 15, 2015, the Debtor filed the *Debtor's Motion for Order: (I) Authorizing Debtor to Cause Its Non-Debtor Subsidiaries to Sell Their Assets Pursuant to the Reinstated and Amended Portfolio Purchase and Sale Agreement Relating to the Texas/East Coast Portfolio; and (II) Authorizing Debtor to Take All Necessary and Appropriate Actions in Connection With The Foregoing* [Docket No. 322] (the "Supplemental Sale Motion").  The Equity Holders objected to the Supplemental Sale Motion.

45.     Separately, Courtland Gettel and certain of his affiliates filed their *Motion for Payment of Property Level Claims from Proceeds of Sale of Property of Non-Debtor Entities* [Docket No. 303] (the "Property Level Claims Motion").  Pursuant to the Property Level Claims Motion, Mr. Gettel and his affiliates asserted tens of millions of dollars of specious claims against the Debtor's subsidiaries and sought payment directly out of sale proceeds at subsidiary levels in an effort to bypass the Debtor and Beach Point.  The claims were based on the theory of equitable subrogation.  The movants argued that they paid certain property level claims and now

-18-

stand in the shoes of such claimants and are entitled to reimbursement by the property level entities.

46.     Following a hearing on May 26, 2015, this Court denied the Property Level Claims Motion on the basis that all such claims pre-dated the Beach Point Settlement Agreement and could not be paid to Defendants or other Affiliates of the Defendant Parties under the Beach Point Settlement Agreement.  *See* Transcript of May 26, 2015 Hearing at p. 69-70 (COURT: "Specifically, I find that the [Beach Point] settlement agreement precludes the assertion of recovery of claims articulated in the motion for payment of property level claims . . . I view the[] equitable subrogation argument to be an effort for, I think, what is an end around the very clear provisions of the settlement agreement that's been entered into.").  The Court also concluded that the movants' equitable subrogation theory would "drive a truck through" the Beach Point Settlement Agreement and that it "defies credulity" that these property level obligations remained viable under the agreement.  *Id*. at p. 71.

> I think the settlement agreement is abundantly clear, and I have now read the Beach Point settlement agreement now several times and I have no uncertainty that the settlement agreement, the broad scope of the releases that were entered into and the restrictions on distribution preclude the relief that is requested or sought through the property level payment motion.  So that motion will be denied.

*Id*.

47.     Based on the foregoing ruling, the Court entered the Order Denying Property Level Claims.  No appeal of the Order Denying Property Level Claims was filed and it is now a final order of this Court.  The Order Denying Property Level Claims also contains a specific

reservation of jurisdiction by this Court "with respect to the interpretation and implementation of this Order." *See* Order Denying Property Level Claims at p. 2.

48.     Despite this Court's denial of the Property Level Claims Motion, the Equity Holders proceeded to pursue their objections to the Supplemental Sale Motion.  Following a two-day evidentiary hearing, this Court granted the Supplemental Sale Motion and entered the *Supplemental Order: (I) Authorizing Debtor to Cause Its Non-Debtor Subsidiaries to Sell Their Assets Pursuant to the Reinstated and Amended Portfolio Purchase and Sale Agreement Relating to Texas/East Coast Portfolio; and (II) Authorizing Debtor to Take All Necessary and Appropriate Actions in Connection With the Foregoing* [Docket No. 381] (the "Supplemental Sale Order"), entered on June 5, 2015.  The Equity Holders commenced an appeal of the Supplemental Sale Order.  The sale of the Texas/East Coast Portfolio remains pending and has not yet closed.

**D.     Defendants' Continued Assertion of Property Level Claims
         and Interference with the Subsidiary Sale Process**

49.     Notwithstanding the terms of the Beach Point Settlement Agreement, the Beach Point Settlement Order, and the Order Denying Property Level Claims and in flagrant disregard of this Court's orders, Defendants Gettel, Doye, Bernstein, Greenberg, Greenberg & Associates, and their Affiliates, or certain of them, are continuing to assert property level claims and to interfere with the subsidiary sale process.  Defendants Greenberg and Greenberg & Associates are also continuing to represent interests adverse to the Debtor and its subsidiaries.

50.     On July 17, 2015, Mr. Greenberg provided the Debtor with copies of numerous property level liens totaling approximately $8.6 million executed by Mr. Gettel on behalf of

certain of his Affiliates, Defendants Forward Progress Enterprises, LLC and Conix, Inc., against

the H14 Portfolio and purportedly recorded with Harris County, Brazoria County, and Dallas

County, Texas on or about July 9, 2015.  True and correct copies of the liens at issue are attached

hereto as **Exhibit A**.  Mr. Greenberg coordinated the filing of these liens against the interests of

his former clients, the Debtor and its subsidiaries.  These liens are based on the same property

level claims and equitable subrogation theory that this Court rejected six weeks earlier through

the entry of the Order Denying Property Level Claims.

51.     On July 17, 2015, Mr. Doye sent two email communications to Michael Lynd

advising him of the property level claims and liens, and threatening that "any purchaser with

notice of these claims has successor liability for the payment of any portion of the claims which

are not paid from the sale proceeds."  A true and correct copy of Mr. Doye's emails (with

attachments) are attached hereto as **Exhibit B**.

52.     On July 20, 2015, Mr. Greenberg, on behalf of Defendant Michael Bernstein, sent

a letter to buyer's counsel advising the buyer of purported claims that exist at property level

entities in connection with certain electricity contracts purportedly guaranteed by Mr. Bernstein.

A true and correct copy of Mr. Greenberg's letter is attached hereto as **Exhibit C**.  The letter

warns that "[e]ach of the service agreements state that the obligation to pay for services runs with

the land and is binding on successors in title."  Mr. Bernstein purported to execute these

agreements as "President" of the Debtor.  Mr. Bernstein previously claimed in the context of

defending the Debtor's request to conduct a Bankruptcy Rule 2004 examination that he was

merely "an analyst" for the Debtor.  *See* Docket No. 430.

-21-

53.     The foregoing actions (a) directly contravene the Beach Point Settlement

Agreement, the Beach Point Settlement Order, and the Order Denying Property Level Claims,

(b) constitute contempt of court, and (c) have the effect of tortiously interfering with the Debtor's

subsidiary sale process.

54.     Another impediment to the sale apparently created by Defendants Gettel, Doye,

Bernstein, Greenberg, Greenberg & Associates, and their Affiliates, or certain of them, is the

existence of a side letter with John Quinlan.  Mr. Quinlan appeared at the hearing on June 4-5,

2015 to support the Equity Holders' objections to the Supplemental Sale Motion.  In the context

of that hearing, the Debtor was informed about a side letter to John Quinlan purportedly authored

by Mr. Greenberg dated September 13, 2013 (the "Purported H14 Side Letter") in connection

with the Debtor's subsidiaries' acquisition of the H14 Portfolio.  A true and correct copy of the

Purported H14 Side Letter is attached hereto as **Exhibit D**.  The Purported H14 Side Letter

purports to grant Mr. Quinlan a right to receive over $4.6 million of the proceeds of a subsequent

sale of the H14 Portfolio.  The side letter was not disclosed to the Debtor's lender, Beach Point,

and constitutes a breach of the Debtor's financing arrangements with Beach Point.  If the

Purported H14 Side Letter is valid, its existence may also constitute a default under the Beach

Point Settlement Agreement.  Moreover, Mr. Greenberg authored an opinion letter in connection

with Beach Point's prepetition loans to the Debtor, which opinion letter includes representations

and opinions that, if accurate, refute the validity or enforceability of the Purported H14 Side

Letter.

55.     The Debtor subsequently learned that a deed of trust (the "<u>Deed of Trust</u>") was filed against one of the Debtor's subsidiary's properties called "Cranbrook Forest Apartments" for the benefit of Local Equities, LLC, which appears to be an affiliate of Mr. Quinlan.  A true and correct copy of the Deed of Trust is attached hereto **<u>Exhibit E</u>**.  The Deed of Trust purports to have been executed by Courtland Gettel on September 13, 2013, but was not recorded until June 12, 2015, exactly one week following the conclusion of the supplemental sale hearing in this case at which Mr. Quinlan testified.  *See* Docket No. 381.  The Deed of Trust was not previously disclosed to the Debtor, and was discovered during the due diligence process in advance of the closing of the sale of the Texas/East Coast Portfolio.

56.     The Deed of Trust presumably relates to Mr. Quinlan's claims arising under the Purported H14 Side Letter, which also was not disclosed to the Debtor until the first day of the supplemental sale hearing.  The beneficiary of the Deed of Trust, Local Equities, LLC, is one of the signatories to the Purported H14 Side Letter.

57.     The recent filing of the previously unasserted Deed of Trust represents another example of certain Defendants' ongoing efforts to interfere with the subsidiary sale process.

**E.     <u>Defendants' Misappropriation of Subsidiary Assets</u>**

58.     On July 15, 2015, the sum of $756,667 was inadvertently deposited by the servicing agent, Trimont Real Estate Advisors ("<u>Trimont</u>"), for the lender, Centennial Commercial Finance Group ("<u>Centennial</u>"), on the H14 Portfolio into a previously dormant account owned by another indirect subsidiary of the Debtor, Laser Focus.

-23-

59.    Normally, on a monthly basis, Centennial funds the net cash collections, rent payments less reserves, and interest payments on the mortgage debt, into a designated bank account held by the H14 Portfolio's property management company, CFLane.  Such funds are then used to pay the property expenses for the H14 Portfolio.  Centennial has been transitioning its bank accounts from Doral Bank to new accounts at Wells Fargo Bank.  As a result, many of the previously automated wire transfers became manual.

60.    On July 25, 2015, Centennial released the monthly funding of the net cash collections in the amount of $756,667.  Unfortunately, the servicing agent, Trimont, did not wire these funds to the account that had been used since the filing of this bankruptcy.  Rather, Trimont used wire instructions that pre-dated the Debtor's bankruptcy, which resulted in these funds being deposited into a previously dormant bank account; Laser Focus Commercial Inv XXXXXX3807, at Wells Fargo Bank.  This bank account is monitored by the Debtor, but the signatories have not been changed as the account is no longer utilized.

61.    On July 16, 2015, the Debtor became aware that the monthly funding from Centennial was sent to the wrong bank account.  The Debtor then accessed the online reporting for the Laser Focus bank account (a true and correct copy is attached hereto as **Exhibit F**) and noted two pending transactions: 1) an online transfer of $1,500 and 2) an outgoing wire debit of $750,000.  The Debtor immediately contacted Wells Fargo to cancel the transactions.

62.    The $750,000 wire transfer was sent to an entity named Tommy Boy, LLC, and that the wire transfer had been confirmed by "Shirley."  Mr. Greenberg's assistant is Shirley Welch.  An internet search confirmed that Tommy Boy, LLC is an Arizona entity with Jeffrey

-24-

Greenberg listed as the agent and with an address of 3915 E. Broadway Blvd, Ste. 400, Tucson, AZ 85711, the same as Mr. Greenberg's prior office address. Upon information and belief, Tommy Boy, LLC is an entity owned and controlled by Courtland Gettel. None of the Defendants have any legal or equitable rights or interests to the misappropriated funds.

63. Counsel to the Debtor immediately contacted Mr. Greenberg on the afternoon of July 16, 2015, to demand information regarding the unauthorized wire transfer. Within the next hour, Mr. Greenberg informed counsel to the Debtor that the funds would be returned the following day. However, despite Mr. Greenberg's assurances, the Debtor's efforts to cancel the wire transfer, and Wells Fargo's attempt to recall the wire, the sum of $750,000 has yet to be been returned to Laser Focus.

64. The foregoing is not an isolated act of misappropriation by Mr. Gettel. In May 2015, the Housing Authority of the City of Lithonia, Georgia sent a check in the amount of $5,920 payable to the Debtor's subsidiary, The Oaks at Stonecrest Apartments, LLC ("Oaks at Stonecrest") at 3915 E. Broadway Blvd., Tucson, AZ 85711, the former office address for the Debtor and Mr. Greenberg. This check belongs to Oaks at Stonecrest and was deposited into a Wells Fargo account titled Oak Capital Proceeds (account number XXXXXX9958) as part of a $8,244 deposit on May 13, 2015. The sum of $5,920 has since been transferred out of this account by or on behalf of Mr. Gettel. Despite demand by the Debtor, Defendants Gettel and Greenberg have refused to return these funds to Oaks at Stonecrest.

65. Separately, Mr. Greenberg and his firm, Greenberg & Associates, are in possession of files that belong to the Debtor and its subsidiaries, as former clients of Mr.

Greenberg and Greenberg & Associates.  Despite demand by the Debtor, on behalf of itself and

its subsidiaries, on Mr. Greenberg to turnover all files belonging to the Debtor, Mr. Greenberg

has refused to honor this demand.

66.     By this complaint, the Debtor seeks the return of all funds misappropriated from

the Debtor and its subsidiaries by Defendant Gettel and his designees and affiliates, and turnover

of all files in the custody, possession, or control of Defendants Greenberg and Greenberg &

Associates that belong to the Debtor.

**F.     Defendants' Prepetition Fraudulent Conduct and
        Breaches of Duty Associated with the Beach Point Loan**

67.     The Debtor, as borrower, and Beach Point, as lender, are parties to that certain

*Amended and Restated Loan Agreement* dated as of October 11, 2013, as amended (the "Beach

Point Loan Agreement"), pursuant to which the Debtor borrowed the sum of $73.5 million to

finance the acquisition of interests in various properties.  Defendants Courtland Gettel,

individually and as trustee for Gettel Children's Trust, Gettel Children's Trust 2, Gettel

Children's Trust 3, and Walker's Dream Trust; Kathryn Nighswander; and Conix, Inc.

guaranteed the debt, initially on a limited basis.  By virtue of the Debtor's bankruptcy filing and

the misconduct alleged below, each of the guarantors is now responsible for the full amount of

the debt owed under the Beach Point Loan Agreement, and have stipulated to judgment in favor

of Beach Point under the Beach Point Settlement Agreement.

68.     Pursuant to the Beach Point Loan Agreement, the Debtor was entitled to sell

certain assets provided that all of the proceeds from each sale were applied toward the

outstanding principal balance of the loan, pursuant to certain conditions.  Specifically, section

4.03(b) of the Beach Point Loan Agreement provides as follows:

> (b)    Borrower may permit a Transfer of a Mortgaged Property (as "Release") upon satisfaction of each of the following conditions precedent on or prior to the date of such Release and all of the proceeds of a Release of an H14 Mortgaged Property shall be applied to the outstanding principal balance of the M1 Note and all of the proceeds of a Release of a Portfolio Property shall be applied to the balance of the M2 Note:
>
> (i)    Borrower shall have caused a Release Request for such Release to be delivered to Administrative Agent concurrently with its delivery to applicable Mortgage Lender;
>
> (ii)    all of the conditions to such Release set forth in the applicable Mortgage Loan Documents shall have been satisfied;
>
> (iii)    no Event of Default has occurred;
>
> (iv)    all representations and warranties of the Loan Parties set forth in the Loan Documents shall be true, correct and complete in all material respects on and as of the date of such Release;
>
> (v)    the gross sales price for the applicable Mortgaged Property shall not be less than the Minimum Sales Price for such Mortgaged Property;
>
> (vi)    Borrower shall have paid to Administrative Agent all of the proceeds from such Release remaining after payment of the release price for such Release pursuant to the applicable Mortgage Loan Documents; and
>
> (vii)    Borrower shall pay all reasonable out-of-pocket costs and expenses incurred by Administrative Agent in connection with such Release, including Administrative Agent's reasonable attorneys' fees.

Beach Point Loan Agreement at § 4.03.

69.    In the months following execution of the Beach Point Loan Agreement, certain

Defendants, on behalf of the Debtor, sent several closing statements to Beach Point purporting to

-27-

document asset sales.  Through these statements, Defendants represented to Beach Point that they paid several entities, including certain Defendants, millions of dollars for legitimate services in connection with asset sales.  On information and belief, these entities never performed legitimate services in exchange for these payments.  Instead, on information and belief, Defendants Gettel, Doye, Bernstein, Wagner, and Greenberg used the entities to funnel money back to themselves.

70.     Just three days after the date of the Beach Point Loan Agreement and within one year of the Petition Date, on or around October 14, 2013, Defendant Doye provided Beach Point with a settlement statement reflecting the sale of a subsidiary asset called "Remington Oaks Apartments" for $23 million.  The Remington Oaks statement indicated the sale had closed on October 8, 2013, three days before the Beach Point Loan Agreement was dated.

71.     The Remington Oaks statement also indicated that $255,000 had been paid to Helena, LLC for "Analysis/Evaluation."  On information and belief, the payment to Helena, LLC was not a legitimate expense of the sale.  This allegation is based on the following facts, among others:  Mr. Bernstein, the principal of Helena, LLC, is also a former officer of the Debtor, the amount paid to Helena, LLC was an unusually high amount for a sale of this size, the Certificate of Formation for Helena, LLC filed with the Secretary of State of the State of Delaware was signed by Shirley Welch, Mr. Greenberg's assistant, and Defendants have been unable to provide documentation substantiating the services that Helena, LLC allegedly provided in connection with the sale.  On information and belief, this charge was designed to withhold proceeds on the sale from Beach Point and to benefit Defendants at the expense of the Debtor.

-28-

72.    Mr. Doye represented to Beach Point in a phone call on or around October 14, 2013 that Defendants were withholding $2 million of the Remington Oaks proceeds otherwise due to Beach Point, but that it would release the $2 million to Beach Point before the end of 2013. Such funds were not released to Beach Point, or to the Debtor.

73.    The Remington Oaks statement indicated that $215,000 had been paid to Greenberg & Associates for legal fees. Defendant Mr. Greenberg negotiated the Beach Point Loan Agreement on behalf of the Debtor. On information and belief, the payment to Greenberg & Associates was not a legitimate expense of the sale. This allegation is based on the following facts, among others: Mr. Greenberg made several material misrepresentations to Beach Point, detailed below, the amount paid to Greenberg & Associates was an unusually high amount for a sale of this size, and Defendants have been unable to provide documentation substantiating the services that Greenberg & Associates allegedly provided in connection with the sale. On information and belief, this charge was designed to withhold proceeds on the sale from Beach Point and to benefit Defendants at the expense of the Debtor.

74.    Mr. Doye provided Beach Point with a closing statement for another subsidiary asset called "Pecan Crossing Apartments" on or around December 10, 2013, at a meeting at Beach Point's offices in Santa Monica, California. The statement indicated Pecan Crossing sold for $10.4 million.

75.    The Pecan Crossing statement indicated that $260,000 had been paid to The Waterfall Group, LLC ("The Waterfall Group"). The principal of The Waterfall Group is Dan Wesson. At the time, Mr. Wesson was also a managing director of the Debtor and/or Conix, Inc.

-29-

Mr. Wesson entered into an agreement with Mr. Gettel that his entity, The Waterfall Group, would accept the funds from the Pecan Crossing sale.  Mr. Wesson would then keep a small percentage of the funds, and kick back the remaining funds back to Sui Generis WS, LLC ("Sui Generis").  Sui Generis is controlled by Mr. Gettel.  Mr. Wesson in fact carried out the scheme by accepting the funds, keeping a percentage, and wiring the rest back to Mr. Gettel through Sui Generis.  Messrs. Gettel and Doye demanded that Mr. Wesson hide this scheme from Beach Point, and Mr. Wesson did so.  Mr. Wesson testified under oath to his participation in this scheme.  The Waterfall Group charge was designed to withhold proceeds on the sale from Beach Point and to benefit Defendants at the expense of the Debtor.

76.     The Pecan Crossing statement also indicated that $87,000 had been paid to Greenberg & Associates.  On information and belief, the payment to Greenberg & Associates was not a legitimate expense of the sale.  This allegation is based on the following facts, among others:  Mr. Greenberg made several material misrepresentations to Beach Point, detailed below, the amount paid to Greenberg & Associates was an unusually high amount for a sale of this size, and Defendants have been unable to provide documentation substantiating the services that Greenberg & Associates allegedly provided in connection with the sale.  On information and belief, this charge was designed to withhold proceeds on the sale from Beach Point and to benefit Defendants at the expense of the Debtor.

77.     On or around December 10, 2013, Beach Point questioned Mr. Doye in a phone call regarding the legal expenses paid to Greenberg & Associates in connection with the Remington Oaks and Pecan Crossing sales.  Mr. Doye responded that the Debtor owed Mr.

-30-

Greenberg for legal expenses associated with prior work and that he had not been paid for such work. Paying Mr. Greenberg for prior work and then misrepresenting it on the closing expense as a closing expense of the Remington Oaks and Pecan Crossing sales constitutes fraud.

78.    On or around February 2014, Beach Point discovered the sales of two more subsidiary assets. One of the assets was a group of storage facilities located in North Carolina and South Carolina ("NC Storage"). The second asset was an apartment complex called "San Marin Apartments" in Tampa, Florida ("San Marin").

79.    Upon discovering the NC Storage and San Marin sales, Beach Point contacted Mr. Doye on February 9, 2014, requesting statements documenting the proceeds from the two sales.

80.    On February 11, 2014, Mr. Doye emailed Beach Point, attaching statements documenting the proceeds from NC Storage and San Marin asset sales.

81.    The NC Storage statement that Mr. Doye sent indicated that the NC Storage asset was sold for approximately $21 million. The statement also indicated that $1.176 million in "[c]omission" had been paid to The Waterfall Group. This was not a legitimate expense of the sale. Neither Mr. Wesson nor The Waterfall Group were registered brokers for the purposes of the NC Storage sale, so they could not accept any commission on that sale. Mr. Wesson nonetheless accepted those funds on behalf of The Waterfall Group, kept a portion, then kicked back the rest to Mr. Gettel through Sui Generis, just as he had done on the Pecan Crossing sale. Mr. Wesson has testified under oath to this arrangement. This arrangement was not disclosed to

-31-

Beach Point.  The Waterfall Group charge was designed to withhold proceeds on the sale from

Beach Point and to benefit Defendants at the expense of the Debtor.

82.     The NC Storage statement also indicated that $110,000 had been paid to

Greenberg & Associates.  On information and belief, the payment to Greenberg & Associates

was not a legitimate expense of the sale.  This allegation is based on the following facts, among

others:  Mr. Greenberg made several material misrepresentations to Beach Point, detailed below,

the amount paid to Greenberg & Associates was an unusually high amount for a sale of this size,

and Defendants have been unable to provide documentation substantiating the services that

Greenberg & Associates allegedly provided in connection with the sale.  On information and

belief, this charge was designed to withhold proceeds on the sale from Beach Point and to benefit

Defendants, at the expense of the Debtor.

83.     The NC Storage statement indicated that, after all of the charges, the total

proceeds on the sale were approximately $6.1 million.  The Debtor was required to pay these

proceeds to Beach Point.  The NC Storage statement indicated that the sale closed on December

13, 2013.

84.     Without Beach Point's knowledge, in or around December 2013, Mr. Gettel

directed that the $6.1 million in proceeds be deposited with Leverage Exchange Group, LLC

("Leverage Exchange"), a 1031 exchange facilitator, in order to complete a 1031 exchange for

NC Storage.  No replacement property was ever acquired, and on January 29, 2014, the $6.1

million was returned to Mr. Gettel's control.

-32-

85.     Even though Gettel controlled the $6.1 million, Messrs. Doye, Gettel, and Greenberg represented to Beach Point in February 2014 that the exchange was still active.  They asked for Beach Point's permission to continue the exchange, and in order to mislead Beach Point into believing it was active, even provided property tours of two properties that might have been acquired through a 1031 exchange.

86.     On March 17, 2014, Mr. Greenberg emailed Beach Point a proposed escrow instruction letter from Mr. Gettel to Brigitte Echave, an escrow agent at Leverage Exchange. The next day, Mr. Greenberg emailed Beach Point a redline of the instruction incorporating Beach Point's comments.

87.     Then on March 28, 2014, Mr. Greenberg emailed Defendants the fully executed instruction.  The instruction was signed by Mr. Gettel and Ms. Echave.  Mr. Doye then forwarded the instruction to Beach Point.  The instruction indicated that Ms. Echave was holding approximately $6.1 million in proceeds from the NC Storage exchange.  The instruction further stated that, prior to releasing the funds to be used for replacement property, Ms. Echave was required to obtain written consent from an agent of Beach Point.  If Beach Point did not give consent to Ms. Echave to release the funds for the purchase of replacement property, the instruction required Ms. Echave to release the funds to Beach Point on June 12, 2014.

88.     The March 28, 2014 instruction that Mr. Greenberg negotiated with Beach Point and that Mr. Doye sent to Beach Point was fabricated by Messrs. Greenberg, Doye, and Gettel. Neither Ms. Echave nor Leverage Exchange had any money under their control as of March 28, 2014.  Ms. Echave never saw the instruction before Mr. Doye sent it to Beach Point and did not

-33-

sign the instruction.  Ms. Echave has testified under oath she did not sign the document.  On

information and belief, Messrs. Greenberg, Doye, and/or Gettel forged Ms. Echave's signature

on the document.  On information and belief, Messrs. Greenberg, Doye, and/or Gettel conspired

to create the forged document to make Beach Point believe that its money was safe with an

escrow agent.

89.     In early June 2014, Beach Point demanded that Ms. Echave and Leverage

Exchange release the $6.1 million to Beach Point's agent on June 12, 2014 pursuant to the March

28, 2014 instruction.

90.     Beach Point's agent received the $6.1 million on June 12, 2014 from Mr.

Greenberg, who attempted to create a bank account in Leverage Exchange's name.  On

information and belief, Mr. Greenberg did so to conceal that the March 28 instruction was

fabricated and to make it appear to Beach Point that it was receiving the $6.1 million from

Leverage Exchange pursuant to the instruction.  In reality, Leverage Exchange had no funds in

its account and the money came from elsewhere.  On information and belief, Mr. Greenberg

conspired with Messrs. Doye and Gettel to misrepresent the origin of the $6.1 million sent to

Beach Point.  The statements submitted by certain Defendants in connection with the Property

Level Claims Motion provide that at least a portion of the $6.1 million sent to Beach Point

originated with Defendant Forward Progress, which had no right, title, or interest to the proceeds

of the NC Storage sale.

91.     The San Marin statement that Mr. Doye sent to Beach Point on February 11, 2014

indicated that the San Marin asset was sold for $9 million.  The statement also indicated that

-34-

$540,000 had been paid to The Waterfall Group.  This was not a legitimate expense of the sale.

On information and belief, neither Mr. Wesson nor The Waterfall Group were registered brokers

for the purposes of the San Marin sale, so they could not accept any commission on that sale.

Mr. Wesson nonetheless accepted those funds on behalf of The Waterfall Group, kept a portion,

then kicked back the rest to Gettel through Sui Generis, just as he had done on the Pecan

Crossing and NC Storage sales.  Mr. Wesson admitted under oath to this conduct.  This

arrangement was not disclosed to Beach Point.  The Waterfall Group charge was designed to

withhold proceeds on the sale from Beach Point and to benefit Defendants at the expense of the

Debtor.

92.     The San Marin statement indicated that $584,602 had been paid to Sui Generis.

On information and belief, the payment to Sui Generis was not a legitimate expense of the sale.

This allegation is based on the following facts, among others:  Sui Generis is the same entity to

which The Waterfall Group provided undisclosed kickbacks, Mr. Gettel controls Sui Generis, the

amount paid to Sui Generis was an unusually high amount for a sale of this size, the Certificate

of Formation for Sui Generis filed with the Secretary of State of the State of Delaware was

signed by Shirley Welch, Mr. Greenberg's assistant, and Defendants have been unable to provide

sufficient documentation substantiating the services that Sui Generis allegedly provided in

connection with the sale.  On information and belief, this charge was designed to withhold

proceeds on the sale from Beach Point and to benefit Defendants at the expense of the Debtor.

93.     The San Marin statement also indicated that $165,000 had been paid to Greenberg

& Associates.  On information and belief, the payment to Greenberg & Associates was not a

-35-

legitimate expense of the sale.  This allegation is based on the following facts, among others:  Greenberg made several material misrepresentations to Beach Point, detailed above, the amount paid to Greenberg & Associates was an unusually high amount for a sale of this size, and Defendants have been unable to provide documentation substantiating the services that Greenberg & Associates allegedly provided in connection with the sale.  On information and belief, this charge was designed to withhold proceeds on the sale from Beach Point and to benefit Defendants, at the expense of the Debtor.

94.     The San Marin Statement also indicated that $54,000 had been paid to Helena, LLC.  On information and belief, the payment to Helena, LLC was not a legitimate expense of the sale.  This allegation is based on the following facts, among others:  Mr. Bernstein, the principal of Helena, LLC, was also an officer of the Debtor, the amount paid to Helena, LLC was an unusually high amount for a sale of this size, the Certificate of Formation for Helena, LLC filed with the Secretary of State of the State of Delaware was signed by Shirley Welch, Mr. Greenberg's assistant, and Defendants have been unable to provide documentation substantiating the services that Helena, LLC allegedly provided in connection with the sale.  On information and belief, this charge was designed to withhold proceeds on the sale from Beach Point and to benefit Defendants, at the expense of the Debtor.

95.     On or around February 13, 2014, Beach Point requested the contracts between the Debtor's indirect subsidiaries, on the one hand, and Sui Generis and The Waterfall Group, on the other.  Beach Point also requested contacts at Sui Generis and The Waterfall Group.

96.     On February 17, 2014, Mr. Doye emailed Beach Point stating that Mike Davies was the contact at Sui Generis, and that he would "have Waterfall for you shortly."

97.     On or around February 18, 2014, Beach Point confronted Mr. Gettel about the large fees paid to The Waterfall Group as reflected on the NC Storage and San Marin statements and Mr. Wesson's role as head of The Waterfall Group and also an employee at the Debtor.  Mr. Gettel represented that The Waterfall Group was a broker on the NC Storage and San Marin sales and received a large commission because it maximized the sales price on those deals.  This representation is false.  The Waterfall Group was not in fact a broker on the NC Storage or San Marin sales.  Mr. Gettel also represented that Mr. Wesson was only an employee of the Debtor because he was sick and needed healthcare benefits.  This representation is false.  Mr. Wesson did not in fact receive healthcare benefits from any Defendants, and he played an active role while he worked for several of the entity Defendants.

98.     On February 18, 2014, Mr. Doye emailed Beach Point a consulting agreement between the Debtor's indirect subsidiary and Sui Generis, as well as two listing agreements indicating The Waterfall Group was a broker on the NC Storage and San Marin sales.  The listing agreements indicating The Waterfall Group was a broker on the NC Storage and San Marin sales were fabricated by Defendants.  The agreements indicated they were signed by Mr. Wesson, but Mr. Wesson never signed the agreements.  On information and belief, Messrs. Doye or Gettel, or someone under their control, forged Mr. Wesson's signatures.  The Waterfall Group was not in fact a legitimate broker on the NC Storage or San Marin sales and did not generate, earn, or receive the broker fees designated on the statement provided to Beach Point.  On

-37-

information and belief, Messrs. Doye, and/or Gettel manufactured these listing agreements to make Beach Point believe The Waterfall Group was performing legitimate services. They did so for the purpose of secretly enriching themselves, at the expense of the Debtor and Beach Point.

99.     The Sui Generis consulting agreement, dated March 15, 2013, states that Sui Generis was contracted to provide public relations advice with respect to a death that occurred on the San Marin Apartments, among other services. That was a false statement designed to cover up Defendants' fraud—the alleged death at the property occurred on July 23, 2013, and was not, and could not have been known on March 15, 2013. On information and belief, the consulting agreement was fabricated by Messrs. Doye, and/or Gettel. On information and belief, Sui Generis did not in fact provide any services in connection with the San Marin Apartments.

100.    Near the end of February, 2014, another subsidiary asset called "Jackson Place Apartments" (also known as Third Maryland) was sold for approximately $2 million. Mr. Doye emailed a statement documenting the sale to Beach Point on February 25, 2014. The Jackson Place statement indicated that $45,000 had been paid to Greenberg & Associates, among other charges. On information and belief, the payment to Greenberg & Associates was not a legitimate expense of the sale. This allegation is based on the following facts, among others: Mr. Greenberg made several material misrepresentations to Beach Point, detailed above, the amount paid to Greenberg & Associates was an unusually high amount for a sale of this size, and Defendants have been unable to provide documentation substantiating the services that Greenberg & Associates allegedly provided in connection with the sale. On information and

belief, this charge was designed to withhold proceeds on the sale from Beach Point and to benefit

Defendants at the expense of the Debtor.

**G.      Defendants' Prepetition Fraudulent Conduct and**
**        Breaches of Duty Associated with the Doral Loan**

101.    The Beach Point loan was a mezzanine loan at the Debtor level.  Another lender,

Doral Bank ("Doral"), loaned money to the property level entities holding the H14 Portfolio.

102.    Defendants caused the Debtor's subsidiaries to request disbursement of

approximately $12 million pursuant to the terms of the loan agreement with Doral, purportedly

in order to complete renovations on several of the subsidiary properties within the H14 Portfolio.

103.    On information and belief, these advances were not being utilized for renovations

as contemplated by Doral.  On or around January 13, 2014, Mr. Doye emailed Beach Point an

excel spreadsheet purporting to document spending of a portion of the Doral disbursement.  The

spreadsheet indicated that Apartment Consulting and Renovations, LLC ("Apartment

Consulting") had been paid approximately $4.2 million, presumably for renovation work.  On

information and belief, Apartment Consulting is not a legitimate entity and it did not complete

$4.2 million worth of renovation work on the properties.  This allegation is based on the

following facts, among others:  Apartment Consulting does not appear to have any physical

offices, and Defendants have been unable to provide documentation substantiating the services

that Apartment Consulting allegedly provided in connection with the renovations.  On

information and belief, Defendants used Apartment Consulting to divert the Doral disbursement

from the renovation work for which it was required to be used at the expense of the Debtor.

-39-

104.    On or around February 16, 2014, Messrs. Bernstein and/or Gettel provided Jack Mullen at Summer Street Advisors ("Summer Street") with an excel spreadsheet purporting to document how a portion of the Doral disbursement had been spent.  Beach Point retained Summer Street in part to review use of the Doral disbursement.  The spreadsheet that Defendants sent to Summer Street indicated that approximately $3.56 million had been paid to Apartment Consulting, $4.88 million to Premier Home Development Group LLC ("Premier Home"), and $2.9 million to Texas Rehab Specialist, LLC ("Texas Rehab").  On information and belief, Apartment Consulting, Premier Home, and Texas Rehab are not legitimate entities and did not complete approximately $11.34 million worth of renovation work on the properties.  On information and belief, Messrs. Gettel, Doye, Greenberg, and/or Bernstein used these entities to divert the Doral disbursement from the renovation work for which it was required to be used.

105.    On information and belief, Mr. Wagner fabricated an invoice from Premier Home to the Debtor in the amount of approximately $4.88 million for the purchase of appliances and other materials for the renovations.  Defendants caused the Debtor to submit the Premier Home invoice to Doral to substantiate disbursement of the loan for capital expenditures on the properties.  The Premier Home invoice submitted to Doral contains the same dollar amount that Messrs. Bernstein and/or Gettel represented to Summer Street was paid to Premier Home.  On information and belief, the Debtor did pay Premier Home $4.88 million.  Mr. Wagner kept $100,000 of the $4.8 million and wired the rest to Helena, LLC.  The $4.8 million was not used on capital expenditures as Defendants had represented.

-40-

106.    On or around April 7, 2014, Mr. Doye emailed Beach Point, copying Mr. Gettel, and represented through what he characterized as an invoice that $4,172,580 of the Doral disbursement was provided to Premier Home purportedly to purchase 15,000 appliances from a company called Pirch, Inc. ("Pirch") in San Diego.  Mr. Wagner is the principal of Premier Home.  At the time, Mr. Wagner was also an employee of Defendants.  On information and belief, Premier Home did not purchase 15,000 appliances and more than half of the approximately $4 million remains unaccounted for.  Lisa Jack, the former Chief Financial Officer of the Debtor, testified under oath that she could not verify the validity of these transactions and was concerned that they may have been part of some form of kickback arrangement.

107.    Aside from the Doral disbursement that was paid to Premier Home, Apartment Consulting, and Texas Rehab, on information and belief, paid approximately $600,000 to Sui Generis.  On information and belief, Sui Generis is not a legitimate entity that provided legitimate services related to the construction work on the properties based on all of the facts stated above.  On information and belief, Sui Generis, like the other entity Defendants, were all part of Defendants' scheme to defraud the lenders at the expense of the Debtor.

108.    The foregoing misconduct enriched Defendants, damaged the Debtor, denuded its assets, and rendered it insolvent and unable to pay its debts, including the obligations owing to Beach Point.  By the time that the Debtor's Chief Restructuring Officer was appointed on August 28, 2014, the Debtor's subsidiary properties were highly distressed and in poor operating condition due to a lack of funding and gross mismanagement.  Income from rental receipts

-41-

received by the property manager were insufficient to address daily maintenance, deferred

capital expenditures, unit turns for move-outs, or basic improvements to the properties.  General

upkeep services for the properties had been terminated.  Rental income received by the property

manager was used to pay payroll, utilities, fees, and emergency repairs to maintain minimum

services.  Site managers had been instructed not to turn units due to a lack of cash to pay the

costs required, which resulted in minimal apartment units ready for new tenants.  Also due to the

lack of funds, no evictions were being filed across the portfolio.  Tenants were staying in units

without paying for a long period of time giving an illusion of higher occupancy.  And perhaps

most worrisome, basic maintenance had not be performed to remedy life safety issues, such as

leaking roofs, clogged pipes, broken air conditioning units, and vermin infestation.

**First Claim for Relief**
**(Against Defendants Gettel, Doye, Bernstein, Greenberg,**
**Greenberg & Associates, and their Affiliates)**
**(Contempt of Court)**

109.    The Debtor hereby realleges and incorporates each of the above paragraphs as

though fully set forth herein.

110.    The Beach Point Settlement Order approves the Beach Point Settlement

Agreement, which provides for the Debtor, without interference from Defendants, to sell the

subsidiary assets and to distribute the proceeds thereof to Beach Point, net of certain legitimate

third party property level claims and a carve out for professionals.

111.    The Order Denying Property Level Claims disallows all property level claims

asserted by Defendants or their designees or Affiliates until Beach Point is paid in full.  In the

context of the Order Denying Property Level Claims, this Court decided that all such property

-42-

level claims, including any claims arising under the theory of equitable subrogation, could not be paid to Defendants or other Affiliates of the Defendant Parties under the Beach Point Settlement Agreement.

112.    Defendants Gettel, Doye, Bernstein, Greenberg, Greenberg & Associates, and their Affiliates, or certain of them, have actual knowledge of the terms of the Beach Point Settlement Order and Order Denying Property Level Claims.

113.    Notwithstanding the terms of the Beach Point Settlement Order, the Beach Point Settlement Agreement, and the Order Denying Property Level Claims, Defendants Gettel, Doye, Bernstein, Greenberg, Greenberg & Associates and their Affiliates, or certain of them, have interfered (and continue to interfere) with the subsidiary sale process by, among other things, (a) continuing to assert property level liens against the Debtor's subsidiary assets, including most recently, through the purported recordation of liens against the H14 Portfolio, (b) contacting the buyer of the subsidiary assets (Lynd) with respect to the asserted property level liens and threatening liability under a successor liability theory, and (c) filing (or coordinating the filing) of the Deed of Trust in favor of Mr. Quinlan's affiliate.

114.    Defendants' conduct has been (and continues to be) in flagrant disregard of the orders of this Court and constitutes contempt of court.  Plaintiff is entitled to an order sanctioning and otherwise punishing Defendants Gettel, Doye, Bernstein, Greenberg, Greenberg & Associates, and their Affiliates, or certain of them, for their wrongful conduct in an appropriate amount to be determined by this Court.

## Second Claim for Relief
**(Against Defendants Gettel, Greenberg, Greenberg & Associates, and Tommy Boy, LLC)**
**(Conversion)**

115.    The Debtor hereby realleges and incorporates each of the above paragraphs as though fully set forth herein.

116.    The Debtor has an indirect ownership interest in Laser Focus and the H14 Portfolio, and a direct ownership interest in Oaks at Stonecrest.  The Debtor has full management control of Laser Focus, the H14 Portfolio, and Oaks at Stonecrest.

117.    Defendants Gettel, Greenberg, Greenberg & Associates, and Tommy Boy, LLC, have no direct ownership or management rights in Laser Focus, the H14 Portfolio, or Oaks at Stonecrest.

118.    Defendants Gettel, Greenberg, Greenberg & Associates, and Tommy Boy, LLC converted assets belonging to Laser Focus, the H14 Portfolio, and Oaks at Stonecrest.

119.    Defendants Gettel, Greenberg, Greenberg & Associates, and Tommy Boy, LLC utilized their access to a previously dormant account at Laser Focus to abscond with $750,000 that was inadvertently deposited there by the servicing agent for the H14 Portfolio.  These funds belong to the Debtor's subsidiaries and are necessary for the operation and maintenance of the H14 Portfolio.

120.    Defendants Gettel, Greenberg, and Greenberg & Associates utilized their access to a bank account in the name of Oaks at Stonecrest to abscond with $5,920 belonging to Oaks at Stonecrest.

DOCS_SF:88152.5 89703/002

121.   The Debtor has made demand for a return of the foregoing funds, but Defendants Gettel, Greenberg, Greenberg & Associates, and Tommy Boy, LLC have not returned such funds.

122.   The Debtor is entitled to an order requiring Defendants Gettel, Greenberg, Greenberg & Associates, and Tommy Boy, LLC to repay all converted funds, plus pre-judgment interest thereon as provided by law, to Laser Focus and Oaks at Stonecrest, respectively.

**Third Claim for Relief**
**(Against Defendants Gettel, Greenberg, Greenberg & Associates, and Tommy Boy, LLC)**
**(Turnover of Misappropriated Funds – 11 U.S.C. §§ 105(a) and 542(a))**

123.   The Debtor hereby realleges and incorporates each of the above paragraphs as though fully set forth herein.

124.   Defendants Gettel, Greenberg, Greenberg & Associates, and Tommy Boy, LLC utilized their access to a previously dormant account at Laser Focus to abscond with $750,000 that was inadvertently deposited there by the servicing agent for the H14 Portfolio.  These funds belong to the Debtor's subsidiaries and are necessary for the operation and maintenance of the H14 Portfolio.

125.   Defendants Gettel, Greenberg, and Greenberg & Associates utilized their access to a bank account in the name of Oaks at Stonecrest to abscond with $5,920 belonging to Oaks at Stonecrest.

126.   The Debtor has made demand for a return of the foregoing funds, but Defendants Gettel, Greenberg, Greenberg & Associates, and Tommy Boy, LLC have not returned such funds.

127.     Defendants Greenberg and Greenberg & Associates also have custody, possession, or control of files belonging to the Debtor and its subsidiaries, but have refused to deliver such files to the Debtor despite demand.

128.     The Debtor is entitled to an order under 11 U.S.C. §§ 105(a) and 542(a) requiring Defendants Gettel, Greenberg, Greenberg & Associates, and Tommy Boy, LLC to turnover all misappropriated funds, plus pre-judgment interest thereon as provided by law, to Laser Focus and Oaks at Stonecrest, respectively.  In addition, the Debtor is entitled to turnover of all files in the custody, possession, or control of Mr. Greenberg and Greenberg & Associates that belong to the Debtor.

### Fourth Claim for Relief
**(Against Defendants Gettel, Doye, Bernstein, Greenberg,**
**Greenberg & Associates, and their Affiliates)**
**(Injunctive Relief – 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 7001(7) and 7065)**

129.     The Debtor hereby realleges and incorporates each of the above paragraphs as though fully set forth herein.

130.     Section 105(a) of the Bankruptcy Code authorizes the Court to issue "any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  Bankruptcy Rules 7001(7) and 7065 authorize the Court to issue injunctions and restraining orders.  Relief under 11 U.S.C. § 105(a) and Bankruptcy Rules 7001(7) and 7065 is particularly appropriate here given that the Debtor is attempting to effectuate a sale that this Court previously approved and will have the effect of maximizing the value of the Debtor's estate.

131.    Injunctive relief is proper because there is a likelihood of success on the merits of the Debtor's claims that Defendants Gettel, Doye, Bernstein, Greenberg, Greenberg & Associates, and their Affiliates, or certain of them:  (a) are willfully violating the terms of the Beach Point Settlement Order, the Beach Point Settlement Agreement, and the Order Denying Property Level Claims, (b) are continuing to interfere with the Debtor's sale of its subsidiary assets through the assertion of property level liens, including the filing of the previously unasserted Deed of Trust, and (c) have misappropriated, within the last week, hundreds of thousands of dollars of subsidiary assets.  Greenberg and Greenberg & Associates are also continuing to represent interests adverse to the Debtor and its subsidiaries.

132.    The Debtor will suffer irreparable harm if such Defendants' interference with the sale process and the Debtor's orderly administration of this estate is not enjoined because the Debtor and its creditors stand to lose a subsidiary sale valued at $205 million, which the Court previously approved and which would yield significant recoveries by this estate.  Such value is absolutely critical to the Debtor's reorganization efforts in this bankruptcy case.

133.    The likelihood of irreparable harm to the Debtor and its bankruptcy estate in the absence of an injunction far outweighs any conceivable harm to Defendants Gettel, Doye, Bernstein, Greenberg, Greenberg & Associates, and their Affiliates, or certain of them, should their efforts to interfere with the sale not be enjoined.  In fact, such Defendants will suffer no legally cognizable harm if the requested injunctive relief is granted because this Court has already decided that such Defendants' property level claims could not be paid to such Defendants or other Affiliates of the Defendant Parties under the Beach Point Settlement

-47-

Agreement.  Hence, Defendants have no right to pursue such claims in the first place and also have no right to any misappropriated funds.  Defendants' ongoing interference with the sale process is nothing more than a blatant attempt by Defendants to extract value from a sale where none is owed.  As part of the Beach Point Settlement Agreement, Defendants agreed not to interfere with the subsidiary sale process, yet that is precisely what they are now doing.  Further, Defendants Greenberg and Greenberg & Associates have an ethical duty not to represent interests adverse to those of their former clients.

134.    Granting the requested preliminary and permanent injunctive relief will be in the public interest as it will further the Debtor's successful reorganization, maximize creditor recoveries by allowing the Court-approved sale to go forward, ensure that ethical rules are being observed, and honor and preserve the sanctity of this Court's prior orders.

135.    Injunctive relief enjoining Defendants from interfering with the sale process, through the assertion of property level liens or otherwise, and misappropriating funds from the Debtor's subsidiaries is both necessary and appropriate under 11 U.S.C. § 105(a).  Accordingly, the Debtor seeks entry of an order enjoining further interference with the subsidiary sale process, compelling Defendants Gettel, Doye, Bernstein, Greenberg, Greenberg & Associates, and their Affiliates, or certain of them, to release and withdraw all property level liens, and requiring such Defendants to return all misappropriated funds and to forbear from taking any further action against the Debtor, its subsidiaries, or any of their respective assets.  The Debtor also seeks an order disqualifying Defendants Greenberg and Greenberg & Associates from continuing to represent any interests adverse to their former clients, the Debtor and its subsidiaries.

-48-

**Fifth Claim for Relief**
**(Against Defendants Gettel, Doye, Bernstein, Greenberg,**
**Greenberg & Associates, and their Affiliates)**
**(Declaratory Judgment – 11 U.S.C. § 362(a) and 28 U.S.C. §§ 2201, 2202)**

136.    The Debtor hereby realleges and incorporates each of the above paragraphs as though fully set forth herein.

137.    The Debtor asserts that Defendants Gettel, Doye, Bernstein, Greenberg, Greenberg & Associates, and their Affiliates, or certain of them:  (a) are willfully violating the terms of the Beach Point Settlement Order, the Beach Point Settlement Agreement, and the Order Denying Property Level Claims, (b) are continuing to interfere with the Debtor's sale of its subsidiary assets through the assertion of property level liens, including the filing of the previously unasserted Deed of Trust, and (c) have misappropriated hundreds of thousands of dollars of subsidiary assets.

138.    An actual, substantial, and justiciable controversy exists between Plaintiff and Defendants Gettel, Doye, Bernstein, Greenberg, Greenberg & Associates, and their Affiliates, or certain of them, concerning such Defendants' conduct with respect to the pending sale of subsidiary assets and misappropriation of estate assets.

139.    Accordingly, the Debtor seeks a declaratory judgment and order from this Court under 28 U.S.C. §§ 2201 and 2202 that Defendants Gettel, Doye, Bernstein, Greenberg, Greenberg & Associates, and their Affiliates, or certain of them, have violated the Beach Point Settlement Order, the Beach Point Settlement Agreement, and the Order Denying Property Level Claims, and that Plaintiff is entitled to equitable relief and damages in an amount to be determined at trial.

**Sixth Claim for Relief**
**(Against Defendants Gettel, Doye, Bernstein, Greenberg, and Greenberg & Associates)**
**(Breach of Fiduciary Duty)**

140.     The Debtor hereby realleges and incorporates each of the above paragraphs as though fully set forth herein.

141.     Defendants Messrs. Gettel, Doye, and Bernstein, at all relevant times prior to the Petition Date, were officers or principals of the Debtor and its subsidiaries.  Defendants Mr. Greenberg and Greenberg & Associates were counsel to the Debtor and its subsidiaries on a prepetition basis.

142.     In such capacities, Defendants Messrs. Gettel, Doye, Bernstein, Greenberg, and Greenberg & Associates owed fiduciary duties to the Debtor and its subsidiaries, including the duties of loyalty, good faith, and due care.

143.     Defendants Gettel, Doye, Bernstein, Greenberg, and Greenberg & Associates breached their fiduciary duties to the Debtor and its subsidiaries by engaging in a broad-ranging scheme to defraud Beach Point and Doral, and to siphon assets away from the Debtor and its subsidiaries, in order to enrich themselves at the expense of the Debtor and its subsidiaries.

144.     The breaches of fiduciary duty by Defendants Gettel, Doye, Bernstein, Greenberg, and Greenberg & Associates have damaged the Debtor, denuded its assets, and rendered it insolvent and unable to pay its debts, including the obligations owing to Beach Point.

145.     Accordingly, the Debtor is entitled to judgment against Defendants Gettel, Doye, Bernstein, Greenberg, and Greenberg & Associates for breaches of fiduciary duty, and the Debtor seeks damages from such Defendants in an amount to be determined at trial.

**<u>Seventh Claim for Relief</u>**
**(Against Defendants Greenberg and Greenberg & Associates)**
**(Professional Negligence/Legal Malpractice)**

146.    The Debtor hereby realleges and incorporates each of the above paragraphs as though fully set forth herein.

147.    Defendants Greenberg and Greenberg & Associates were, at all relevant times prior to the Petition Date, counsel to the Debtor and its subsidiaries.

148.    In such capacities, Defendants Greenberg and Greenberg & Associates owed professional and ethical duties to the Debtor and its subsidiaries, including the duties of good faith and fidelity, and the duty to exercise and perform their services with skill, prudence, diligence, and due care.  The duties owed by Defendants Greenberg and Greenberg & Associates to the Debtor and its subsidiaries are also defined and set forth in applicable rules of professional conduct.

149.    Defendants Greenberg and Greenberg & Associates breached their professional and ethical duties to the Debtor and its subsidiaries by engaging in a broad-ranging scheme to defraud Beach Point and Doral, and to siphon assets away from the Debtor and its subsidiaries, in order to enrich themselves at the expense of the Debtor and its subsidiaries.

150.    Defendants Greenberg and Greenberg & Associates breached their professional and ethical duties to the Debtor and its subsidiaries by continuing to represent Mr. Gettel and his affiliates in matters adverse to the interests of the Debtor and its subsidiaries, as former clients of Mr. Greenberg and Greenberg & Associates.  Mr. Greenberg coordinated the filing of numerous property level liens totaling approximately $8.6 million executed by Mr. Gettel on behalf of his affiliates, Defendants Forward Progress Enterprises, LLC and Conix, Inc., against the H14

-51-

Portfolio and purportedly recorded with Harris County, Brazoria County, and Dallas County, Texas on or about July 9, 2015.  These liens are adverse to the interests of the Debtor and its subsidiaries and are based on the same property level claims and equitable subrogation theory that this Court rejected six weeks earlier through the entry of the Order Denying Property Level Claims.  Further, on July 20, 2015, Mr. Greenberg, on behalf of Defendant Michael Bernstein, sent a letter to buyer's counsel advising the buyer of purported claims that exist at property level entities in connection with certain electricity contracts purportedly guaranteed by Mr. Bernstein. This claim is also adverse to the interests of the Debtor and its subsidiaries.

151.    Defendants Greenberg and Greenberg & Associates committed professional malpractice through the Purported H14 Side Letter, which was authored by Mr. Greenberg and purports to grant Mr. Quinlan a right to receive over $4.6 million of the proceeds of a subsequent sale of the H14 Portfolio.  The side letter was not disclosed to the Debtor's lender, Beach Point, and constitutes a breach of the Debtor's financing arrangements with Beach Point.  At the same time, Mr. Greenberg authored an opinion letter in connection with Beach Point's prepetition loans to the Debtor, which opinion letter includes representations and opinions that, if accurate, refute the validity or enforceability of the Purported H14 Side Letter.  Mr. Greenberg and his firm, Greenberg & Associates, acted for their own benefit or for the benefit of Mr. Gettel, and at the expense of the Debtor and its subsidiaries.

152.    More recently, Mr. Greenberg violated his professional and ethical duties to the Debtor and its subsidiaries, as former clients, by participating in an unauthorized transfer of $750,000 from a Laser Focus bank account to Tommy Boy, LLC, which is believed to be an

affiliate of Mr. Gettel.  Mr. Greenberg also has refused, despite demand, to turnover all files belonging to the Debtor.

153.    The breaches of professional duties by Defendants Greenberg and Greenberg & Associates have damaged the Debtor, denuded its assets, and rendered it insolvent and unable to pay its debts, including the obligations owing to Beach Point.

154.    Accordingly, the Debtor is entitled to judgment against Defendants Greenberg and Greenberg & Associates for professional negligence and legal malpractice, and the Debtor seeks damages from such Defendants in an amount to be determined at trial.

### Eighth Claim for Relief
**(Against All Defendants)**
**(Recovery of Fraudulent Transfers – 11 U.S.C. §§ 548, 550)**

155.    The Debtor hereby realleges and incorporates each of the above paragraphs as though fully set forth herein.

156.    Defendants engaged in a broad-ranging scheme to defraud Beach Point and Doral, and to siphon assets away from the Debtor and its subsidiaries, in order to enrich themselves at the expense of the Debtor and its subsidiaries.  Any and all transfers of assets of the Debtor and its subsidiaries effectuated by Defendants as part of their fraudulent activities constitute transfers of interests of the Debtor in property.

157.    Such transfers all occurred within one year prior to the Petition Date.

158.    Defendants made all such transfers with actual intent to hinder, delay, or defraud any entity to which the Debtor was or became, on or after the date that such transfer was made, indebted.  Such defrauded entities include Beach Point and other creditors.

159.    The Debtor received less than reasonably equivalent value in exchange for the transfers.

160.    The Debtor was insolvent on the date that such transfers were made, or was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the Debtor was an unreasonably small capital.

161.    The Debtor is entitled to an order and judgment under 11 U.S.C. § 548 that each of the foregoing fraudulent transfers is avoided, and the Debtor is further entitled to recover for the estate the value of each transfer under 11 U.S.C. § 550 in an amount to be determined at trial.

WHEREFORE, the Debtor requests entry of judgment against Defendants as follows:

a.    For a determination and judgment on the First Claim for Relief finding that Defendants Gettel, Doye, Bernstein, Greenberg, Greenberg & Associates, and their Affiliates, or certain of them, are in contempt of court for violating the terms of the Beach Point Settlement Order and the Order Denying Property Level Claims, and sanctioning and otherwise punishing such Defendants for their wrongful conduct in an appropriate amount to be determined by this Court;

b.    For a determination and judgment on the Second Claim for Relief under 11 U.S.C. § 542 requiring repayment of all converted funds, plus pre-judgment interest thereon as provided by law, by Defendants Gettel, Greenberg, Greenberg & Associates, and Tommy Boy, LLC to Laser Focus and Oaks at Stonecrest, respectively;

-54-

c.    For a determination and judgment on the Third Claim for Relief under 11 U.S.C. § 542 requiring turnover of misappropriated funds, plus pre-judgment interest thereon as provided by law, by Defendants Gettel, Greenberg, Greenberg & Associates, and Tommy Boy, LLC to Laser Focus and Oaks at Stonecrest, respectively, and turnover of all files in the custody, possession, or control of Defendants Greenberg and Greenberg & Associates that belong to the Debtor;

d.    For a determination and judgment on the Fourth Claim for Relief that the Debtor is entitled to a preliminary and permanent injunction under 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 7065 enjoining Defendants Gettel, Doye, Bernstein, Greenberg, Greenberg & Associates, and their Affiliates, or certain of them, from further interference with the subsidiary sale process, compelling such Defendants to release and withdraw all property level liens, requiring such Defendants to return all misappropriated funds and to forbear from taking any further action against the Debtor, its subsidiaries, or any of their respective assets, and disqualifying Defendants Greenberg and Greenberg & Associates from continuing to represent any interests adverse to their former clients, the Debtor and its subsidiaries;

e.    For a determination and judgment on the Fifth Claim for Relief under 28 U.S.C. §§ 2201 and 2202 that Defendants Gettel, Doye, Bernstein,

-55-

Greenberg, Greenberg & Associates, and their Affiliates, or certain of

them, have violated the Beach Point Settlement Order, the Beach Point

Settlement Agreement, and the Order Denying Property Level Claims, and

that Plaintiff is entitled to equitable relief and damages in an amount to be

determined at trial;

f.　　For a determination and judgment on the Sixth Claim for Relief against

Defendants Gettel, Doye, Bernstein, Greenberg, and Greenberg &

Associates for breach of fiduciary duty, and awarding damages from such

Defendants in an amount to be determined at trial;

g.　　For a determination and judgment on the Seventh Claim for Relief against

Defendants Greenberg and Greenberg & Associates for professional

negligence and legal malpractice, and awarding damages from such

Defendants in an amount to be determined at trial;

h.　　For a determination and judgment on the Eighth Claim for Relief under 11

U.S.C. § 548 against all Defendants that each fraudulent transfer described

herein is avoided, and the Debtor is further entitled to recover for the

estate the value of each fraudulent transfer under 11 U.S.C. § 550 in an

amount to be determined at trial;

i.　　For costs of suit and other expenses incurred in this action; and

j.　　For such other and further relief as the Court deems just and proper.

-56-

Dated: July 21, 2015                        PACHULSKI STANG ZIEHL & JONES LLP


                                            */s/ Peter J. Keane*_____
                                            Richard M. Pachulski (CA Bar No. 90073)
                                            Alan J. Kornfeld (CA Bar No. 130063)
                                            Maxim B. Litvak (CA Bar No. 215852)
                                            Peter J. Keane (Bar No. 5503)
                                            919 North Market Street, 17th Floor
                                            P.O. Box 8705
                                            Wilmington, Delaware 19899-8705 (Courier 19801)
                                            Telephone:  (302) 652-4100
                                            Facsimile:  (302) 652-4400
                                            Email:  rpachulski@pszjlaw.com
                                                    akornfeld@pszjlaw.com
                                                    mlitvak@pszjlaw.com
                                                    pkeane@pszjlaw.com

                                            Counsel to Plaintiff
                                            Variant Holding Company, LLC